ARO MANUFACTURING CO., Inc., et al., Defendants, Appellants,

v.

CONVERTIBLE TOP REPLACEMENT CO., Inc., Plaintiff, Appellee.

No. 5488.

United States Court of Appeals
First Circuit.

Heard June 4, 1959.

Decided Aug. 31, 1959.

Rehearing Denied Sept. 15, 1959.

David Wolf and Charles Hieken, Boston, Mass., Ezekiel Wolf, Wolf & Greenfield, Boston, Mass., on the brief, for appellants.

Elliott I. Pollock, Washington, D. C., Paul V. Power, Boston, Mass., on the brief, for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

**WOODBURY, Chief Judge.**

This is an appeal from an interlocutory judgment ordering, adjudging and decreeing that claims 3, 4, 5, 7, 8, 9 and 10 of United States Patent No. 2,569,724, issued on October 2, 1951, to Harry A. Mackie and Stanley Duluk for "Convertible Folding Top with Automatic Seal at Rear Quarter" are valid and have been infringed by the defendants, that the defendants, their officers, agents and servants be enjoined from further infringement, and that the question of the plaintiff's damages for past infringement be referred to a Master.

The plaintiff-appellee, Convertible Top Replacement Co., Inc., is the possessor by territorial grant of the right, title and interest in and to the Mackie-Duluk patent in and for the Commonwealth of Massachusetts together with all rights of action accruing since December 30, 1953, for infringement thereof in the Commonwealth. The defendants manufacture and sell, for replacement purposes only, the fabric portions of convertible tops which they either install themselves or sell pre-fabricated for installation by trimmers, that is to say, persons engaged in the business of putting on new tops, repairing upholstery etc., and, to an insignificant extent, to do-it-yourself car owners. The defendants' tops are custom-designed by make of car and year of manufacture to permit accurate replacements on all standard cars manufactured in the United States and are so advertised. They pre-fabricate and keep in stock the fabric parts only of convertible tops for various models of cars manufactured by the Ford Motor Company from 1952 to 1955, and for many models of General Motors cars manufactured for the years 1950 to 1954, when many convertible automobiles produced by those two manufacturers were equipped with Mackie-Duluk tops.

The District Court resolved the issue of the validity of the claims of the Mackie-Duluk patent in suit in favor of the plaintiff. It said: "Mackie-Duluk was a substantial and enlightened step, filling a long-felt want, in a field in which defendants have produced, with one exception, only paper patents, the most emphasized being foreign, which did not even purport to do what Mackie-Duluk accomplished." On this appeal, however, the question of validity has hardly been argued at all and we are not at all sure that all the evidence on that issue has been included in the parts of the record

printed in the joint record appendix before us. Under these circumstances we can only take the validity of the patent claims in suit for granted and turn immediately to the hotly contested issue of infringement.

The basic question argued before us on this appeal is whether the defendants, by manufacturing and selling replacement convertible top fabrics cut to fit and adapted for use in the combination of elements covered by the plaintiff's patent, are guilty of contributory infringement as defined in Title 35 U.S.C. § 271(c), or whether, in doing what they did, they merely were making a permissible replacement of a part which expectedly became worn out or defective sooner than other parts of the patented combination.

In addressing ourselves to this question we turn first to the patent in suit and its prior art.

Folding tops for vehicles consisting of bows of wood or metal covered with a flexible waterproof fabric (in the days of "The Deacon's Masterpiece; or, The Wonderful 'One-Hoss Shay' " [1] with leather) are, of course, as old as the automobile art which in the beginning only adopted with necessary modifications the much older art of collapsible tops for chaises, buggies and some other horse drawn vehicles. The rear panels of the folding tops of earlier days were fastened permanently at the bottom to the outside of the top of the rear portion of the body of the vehicle, and the quarters, the rear portions of the sides of the vehicle, if protected at all, were protected with flaps or curtains, sometimes integral with the top and sometimes not, fastened at the bottom to the outside of the top of the body with buttons, snaps or some equivalent means of fastening. Naturally, to prevent tearing, these quarter flaps had to be unfastened by hand when the top was lowered and when the top was put up fastened again by hand for neat appearance and also to prevent the entrance of rain. This manual fastening and unfastening of the bottoms of the quarter flaps presented no great problem until the advent of the so-called convertible automobile with a folding top operated mechanically rather than manually. The problem presented by the quarter flaps of tops of this kind was first partially solved by fastening the bottom of the flap to the outside of the top of the body of the vehicle with "releasable fastening means," that is to say, with some sort of slide fastening device which would detach automatically when the top was lowered. The major part of the problem remained, however, for when the top was put up the flaps had to be fastened manually, which meant that the operator was required to get out of the car altogether, or at least to reach out, often, of course, in the rain. The object of the Mackie-Duluk patent was "to provide an automatic fastening and sealing means at the top and sides of the tonneau of the convertible" which "never has to be operated or touched by the driver of the car." And, as we have already indicated, the District Court found that the patentees succeeded in attaining their object by devising a patentable combination of elements.

The Mackie-Duluk device consisted of providing an elongated flap integral with the quarter sections of the fabric top adapted to be permanently fastened at the bottom deep within the body of the car, at or perhaps below, but certainly not in front, of the axis of rotation of the bows, to a trough welded to the body of the car and provided with a drain to carry off water entering between the flap and the car body. In addition, to minimize the entrance of water between the body and the flap, they provided a "wiper arm" so-called, which in effect acted as an additional, low rearward bow pressing the downwardly extending flap outwardly against the top of the body of the vehicle as the top is raised from its folded position to close, or substantially to close, any gap there might be between the inside of the top of the body of the

---

1.  Poem by Oliver Wendell Holmes, 1857–1858:

"Boot, top, dasher, from tough old hide
Found in the pit when the tanner died."

car and the flap extending downward into the interior of the automobile body.

Claim 8 of the patent may be taken as typical of those in suit. It reads:

"In a convertible automobile body, the combination of a lower metal body structure or tonneau having a body panel, a folding bow structure supported by the tonneau and having flexible top material supported by the bows and having the top material at the rear quarter extending down, a rain trough secured to the bottom of said flexible top material and to said panel on the inside and below the top of the metal body or tonneau, said flexible top material spreading and adjoining the inside of the top of the side of the tonneau when the bow structure is raised, and a wiping arm secured to a part of the movable bow structure and acting simultaneously with said bow structure to engage the inside lower portion of the top material in raising the top to press the two adjoining members toward each other and thereby produce a weather seal therebetween."

The defendants, as we have said, manufacture and sell only the fabric part of the convertible top structure. And from this they argue at length that, since fabric tops stretched over bows are admittedly very old in the vehicle art, they are only producing an unpatentable component of the combination covered in the patent in suit. If the argument were sound "there would be nothing to discuss," as the Court pointed out in Heyer v. Duplicator Mfg. Co., 1923, 263 U.S. 100, 101, 44 S.Ct. 31, 32, 68 L.Ed. 189. The argument, however, is unsound for the Mackie-Duluk patent does not broadly cover the fabric portion of a folding top of any form or shape. It specifically covers the fabric part of such a top of a particular form or shape, *i. e.,* one with elongated flaps at the rear quarters designed to extend deep within the body of the convertible automobile for permanent attachment to a rain trough at or below the axis of rotation of the bows. It is true that the District Court found that it was not new to bring "the fabric from outside the tonneau at the rear quarters, inside." But it found that the patentees were the first to extend the flaps down far enough so that their bottom lines were at the axis of rotation of the bows and to show that there the fabric could be permanently attached to the bows and the tonneau without ripping when the top was lowered or raised, and that therein lay the patentable novelty of the patentees' fabric.[2]

Form being patentable in itself, see Wilson v. Simpson, 1850, 9 How. 109, 123, 13 L.Ed. 66, in which it is said: "Form may be given to a piece of any material,—wood, metal, or glass—so as to produce an original result, or to aid the efficiency of one already known, and that would be the subject for a patent," we come to the question whether the shape of the patentees' fabric constituted "a material part of the invention" within the meaning of that phrase as used in § 271 (c) of Title 35 U.S.C. quoted in the margin.[3]

---

2. Since the element replaced by the defendants-appellants was a patented component of the Mackie-Duluk combination, the cases of Morgan Envelope Co. v. Albany Paper Co., 1894, 152 U.S. 425, 14 S.Ct. 627, 38 L.Ed. 500, and Micromatic Hone Corp. v. Mid-West Abrasive Co., 6 Cir., 1949, 177 F.2d 934, upon which they rely, are not in point, for the elements replaced by the defendant in those cases, the roll of toilet paper and the abrasive stone, respectively, were not patented elements of the devices covered by the patents there in suit.

3. "Whoever sells a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use, shall be liable as a contributory infringer."

■ Reading this section in the light of the earlier decisions to be considered presently we do not think it could have been intended to prevent the rightful owner of a patented machine from making repairs to a broken, worn or defective part, even though covered by the patent, either himself or through someone other than the patentee. Nor do we think the section is to be read to prevent the owner of a patented machine from replacing from a source other than the patentee minor patented parts of a combination which in the normal use of the machine may be expected frequently to wear out or break and hence to require replacement at short intervals to keep the whole machine in working order and condition. That is to say, we think the rule stated and applied in Wilson v. Simpson, 1850, 9 How. 109, 13 L.Ed. 66, and Heyer v. Duplicator Mfg. Co., 1923, 263 U.S. 100, 44 S.Ct. 31, 68 L.Ed. 189, is still the rule under Title 35 U.S.C. § 271(c).

In the Wilson case the Court held that the owner of a patented planing machine had the right to keep his machine in operation by replacing the patented cutting knives therein from sources other than the patentee, it appearing that the knives, although an essential element of the patented combination, could be expected in the normal use of the machine to wear out, become useless and require replacement at least every sixty or ninety days. In reaching this result the Court said at page 125:

"The right of the assignee[the owner of the machine] to replace the cutter-knives is not because they are of perishable materials, but because the inventor of the machine has so arranged them as a part of its combination, that the machine could not be continued in use without a succession of knives at short intervals. Unless they were replaced, the invention would have been but of little use to the inventor or to others. The other constituent parts of this invention, though liable to be worn out, are not made with reference to any use of them which will require them to be replaced. These, without having a definite duration, are contemplated by the inventor to last so long as the materials of which they are formed can hold together in use in such a combination. No replacement of them at intermediate intervals is meant or is necessary. They may be repaired as the use may require. With such intentions, they are put into the structure. So it is understood by a purchaser, and beyond the duration of them a purchaser of the machine has not a longer use. But if another constituent part of the combination is meant to be only temporary in the use of the whole, and to be frequently replaced, because it will not last as long as the other parts of the combination, its inventor cannot complain, if he sells the use of his machine, that the purchaser uses it in the way the inventor meant it to be used, and in the only way in which the machine can be used."

In Heyer the question was whether the owners of certain costly and durable patented duplicating machines were entitled to replace from any source they chose the patented bands of gelatine used in the machines for transferring the print to be multiplied, which bands were of a size, were attached to spools adapted for, and were intended for use in the patented machine. In answering this question in the affirmative the Court specifically pointed out that while the machine might last indefinitely the bands were exhausted after limited use, about one hundred copies, and were "cheap and common article of commerce." Reaffirming the Wilson case it said:

"The owner when he bought one of these machines had a right to suppose that he was free to maintain it in use, without the further consent of the seller, for more than the sixty days in which the present gelatine might be used up."

And then the Court said that in cases of this sort the judicial function is "only to

establish the construction of a bargain on principles of common sense applied to the specific facts."

■ When replacement of a patented component of a patented combination constitutes a legitimate repair and when it constitutes a forbidden reconstruction of the combination of which it forms a part is difficult to determine and cannot be determined by the application of any verbal formula. Each case must be decided on its own facts, pretty much as an individual instance. This court put the problem neatly and succinctly in Goodyear Shoe Machinery Co. v. Jackson, 1 Cir., 1901, 112 F. 146, 150, 55 L.R.A. 692, wherein it is said:

> "It is impracticable, as well as unwise, to attempt to lay down any rule on this subject, owing to the number and infinite variety of patented inventions. Each case, as it arises, must be decided in the light of all the facts and circumstances presented, and with an intelligent comprehension of the scope, nature, and purpose of the patented invention, and the fair and reasonable intention of the parties. Having clearly in mind the specification and claims of the patent, together with the condition of decay or destruction of the patented device or machine, the question whether its restoration to a sound state was legitimate repair, or a substantial reconstruction or reproduction of the patented invention, should be determined less by definitions or technical rules than by the exercise of sound common sense and an intelligent judgment."

■ Applying as best we can the "common sense" test of the case last cited and the Heyer case we conclude that the defendants were not making permissible repairs to, but were substantially reconstructing, the convertible top combination covered by the Mackie-Duluk patent. Couched in terms of the statute, we think they were making and selling a component of the plaintiff's patented combination "constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use." [4]

■ In substantiation of this conclusion we point out that the fabric portion of the top is not a minor or relatively inexpensive component of the patented combination, or a part of the invention which expectably would wear out after a very short period of use, like the cutter-knives in the Wilson case or the bands of gelatine in the Heyer case. There was testimony, and the court below found, that barring accidental damage the average life of a convertible top was about three years, although with care under favorable conditions or in the hands of a person not too fastidious as to appearance it would last much longer. The expectable life span of the fabric is no doubt shorter than the expectable life span of the other components of the convertible top and of the car itself. But the life of the fabric is not so short, nor is the fabric so cheap, that we can safely assume that an owner would rationally believe that in replacing it he was making only a minor repair to his top structure. On the contrary, we believe that replacing the fabric would be counted a major reconstruction of the top assembly.

---

**4.** The appellants do not establish that their prefabricated tops of which complaint is made are staple articles or commodities of commerce "suitable for substantial noninfringing use," and thus escape application of the statute, by pointing out that the tops it pre-fabricates for convertibles having the Mackie-Duluk structure can be applied in a noninfringing way by cutting off the flaps and putting on snap fasteners to cooperate with the snap fasteners on the outside of the top of the tonneau to hold the cover or boot customarily provided to cover the top and protect it from dust when the top is down. The fact remains that the appellants do not make tops for Mackie-Duluk equipped convertibles for application in the old fashioned prior art way but only in the way shown in the Mackie-Duluk patent.

In short, we agree with the District Court's finding of infringement.

Other arguments advanced by the appellants have been considered but are rejected as too insubstantial to call for discussion.

Judgment will be entered affirming the judgment of the District Court.